In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00540-CR**
_____

**MARK THOMAS FONTENOT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B-120155-R**

**MEMORANDUM OPINION**

A jury found Mark Thomas Fontenot guilty of felony theft. The jury assessed punishment, and the trial court sentenced Fontenot to eighteen months of confinement in state jail. We conclude the evidence is sufficient to support the jury's verdict.

THE EVIDENCE

James Owens, a trooper with the Texas Department of Public Safety, was patrolling the Sabine River bridge area in Orange County in his marked vehicle. He exited the interstate to take the turnaround under the bridge and noticed a man,

1

identified at trial as Fontenot, walking along the "marsh area next to the highway." Fontenot was carrying a roll of copper wire. When they made eye contact, Fontenot dropped the wire and ran into the marsh.

Owens called the Orange Police Department. He surveyed the area with responding officers and then went back to his routine duties in the area while the officers waited to see if the suspect would come out. According to Owens, utility poles above and in the vicinity where he saw Fontenot had wires hanging down as if they had been cut.

Owens took Caleb Davis, a police officer for the City of Orange, to where Fontenot dropped the roll of wire. They laid logs across the muddy area to get to the wire. According to Davis, the wire was not muddy but was laying on top of the mud. The roll of wire and photographs of the wire were admitted into evidence.

According to Davis, he saw the roll of wire directly under a path of utility poles of the interstate and there was a "freshly beaten" path in the area. The beaten path was located directly under and between the poles and made it appear that someone had walked from pole to pole to roll the wire up. Davis testified the path seemed freshly made and made by a human rather than an animal. He could see wire that appeared to have been cut, hanging from the poles, and the wire was the same type of wire that was recovered. Davis explained that the area of the beaten

2

path under those poles was not an area used by people to catch bait as there was not sufficient water for bait.

Law enforcement officers searched the area where Fontenot fled and photographed the area around the utility poles where the wire was cut. Davis and another officer searched the woods and the marshy area for signs of anyone in the area, tools, or anything else that someone might have dropped. Davis drove his vehicle to the boat ramp, which was about half of a mile from where he met Owens. Davis was looking for boats, trucks, or any signs that people had been in the area. According to Davis, the parking lot was empty and there were no signs that anyone had been there that day. Davis did not see any fishing poles or tackle boxes. He and the other officer searched the area for an hour while looking for evidence.

The Orange Police Department asked Randy Hairston, a service man for Entergy, to come to the Sabine River turnaround. According to Hairston, as he neared the turnaround, he observed "somebody coming up out of the swamp[.]" When he got to the turnaround, he asked the officers if they were looking for a "guy wearing a plaid shirt[,]" and Hairston told them where he had seen the suspect. Officers detained Fontenot a short time later, more than a mile away. Law enforcement officers showed Hairston the wire they recovered; Hairston recognized it immediately as Entergy's wire. After Trooper Owens identified

3

Fontenot as the man he had seen earlier carrying a roll of copper wire, the police took Fontenot to jail.

Michael Swope, a utility foreman for Entergy, testified that he did not give anyone permission to take Entergy's copper wire from that area. He testified that Entergy does not abandon copper wire at its job sites, and that Entergy took unused wire to use elsewhere. Swope explained that someone could get to Entergy's wire by climbing up and cutting it down or the person could cause the wire to sag so it could be reached.

Fontenot testified at trial and explained why he was in the area and had the wire. According to Fontenot, his daughter's boyfriend dropped him off that day to fish. Although Fontenot stated that he fished often, he did not have a Texas or Louisiana fishing license. Fontenot testified that he was fishing that day at the boat launch. He went to a swamp area, about half a mile from underneath the bridge and just off the river, and used his dip net to catch bait. He described the depth of the water in that area as anywhere from two feet deep to waist deep, depending on the tide. He had a five-gallon bucket and tackle box with him. He left his rod and reel at the boat launch.

According to Fontenot, while seining for bait, the copper wire snagged on his net, and he pulled the wire out of the water. He washed the wire off and rolled it up. He assumed that storms over the years caused the wire to fall in the water. He

did not attempt to find the owner because there were no people, houses, or businesses in the vicinity. Fontenot admitted that he was carrying the copper wire when Owens saw him coming out of the marsh, but he denied that he intended to steal the wire. Fontenot agreed that he planned to sell the copper wire. According to Fontenot, he ran from the police because he did not have a fishing license and because he believed he had unpaid tickets. He explained that he did not have a ladder, rubber gloves, or any tool he could have used to cut the wire or to climb a utility pole. Fontenot admitted he had "scrapped" copper for the last six or seven years, as well as aluminum cans. There was also evidence that less than two months before this incident, Fontenot had been convicted for possessing stolen goods with a value of less than five hundred dollars.

Karla Rogers, who was initially appointed as Fontenot's counsel, also testified for Fontenot. She withdrew as counsel after she disclosed that she could be called as a witness. According to Rogers, during her representation of Fontenot, he told her about a tackle box he had with him that she later found at the scene. Rogers also located a little carrying case, but did not find a five gallon bucket, dip net, or fishing rod. Fontenot subsequently identified the tackle box as his. Rogers explained that the tackle box looked like it had been there "a long time" because it was very dirty. Rogers's bill, though, did not indicate that she incurred any

expense related to Fontenot's case on the day she located the tackle box that Fontenot claimed belonged to him.

## STANDARD OF REVIEW

Fontenot argues the evidence is insufficient to support his conviction. When examining the sufficiency of the evidence, an appellate court reviews all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We must give full deference to the fact-finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 319).

## CONCLUSION

A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code Ann. § 31.03(a) (West Supp. 2013). "Appropriation of property is unlawful if . . . it is without the owner's effective consent[.]" *Id.* § 31.03(b)(1). Unexplained personal possession of recently stolen property will support an inference of guilt. *See Sutherlin v. State*, 682 S.W.2d 546, 549 (Tex. Crim. App. 1984), *Jackson v. State*, 12 S.W.3d 836, 839 (Tex. App.—Waco 2000, pet. ref'd). If a defendant offers an explanation for his

6

possession of recently stolen property, the record must demonstrate that the defendant's explanation at the time his possession is called into question is either false or unreasonable before the evidence will support the conviction of theft. *Jackson*, 12 S.W.3d at 839. The falsity of the explanation may be shown by circumstantial evidence. *Id.* at 840. Whether an explanation is true or reasonable is a question of fact. *Dixon v. State*, 43 S.W.3d 548, 552 (Tex. App.—Texarkana 2001, no pet.). Fontenot argues it is reasonable to believe that the copper wire was abandoned, and he contends that his and Ms. Rogers's testimony created reasonable doubt that he committed theft.

The jury could reasonably believe Davis's testimony that the area of the beaten path under the poles with the cut wire was not an area someone would go to catch bait. The State presented the jury with evidence that, after Fontenot fled from the police, the police searched the area but did not find Fontenot's fishing rod, five gallon bucket, tackle box, or dip net. Flight is a circumstance that indicates guilt. *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983). Even if the jury could reasonably believe that the tackle box Rogers recovered was Fontenot's, the jury could reasonably disbelieve Fontenot's testimony that he found the "abandoned" copper wire in the water while he was fishing, as well as his testimony that he did not intend to steal the copper wire. We give deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the

7

evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. In this case, the jury was presented with sufficient evidence to permit them to infer Fontenot's possession of recently stolen property as a circumstance of guilt. *See Hardesty*, 656 S.W.2d at 77. Considering the record as a whole, we hold that the evidence is sufficient to support the jury's verdict. We overrule Fontenot's issue and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 29, 2013
Opinion Delivered November 27, 2013
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

8